**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 23-cr-00026-7 |
| | : | |
| TERRENCE MAXWELL | : | |

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                    **January 17, 2024**

Defendant was named, along with several co-defendants, in a Superseding Indictment charging them with conspiracy to commit drug trafficking and other drug and firearm offenses. Presently before the Court is Defendant's pretrial motion to suppress evidence seized from him and a black bag during warrantless searches. As explained below, the motion to suppress will be denied.

## I.    BACKGROUND

On January 24, 2023, the Grand Jury returned an Indictment charging Defendant Terrence Maxwell ("Maxwell") and eight co-defendants, most of whom were alleged members of the Gillard Street Gang, with conspiracy to distribute illegal narcotics as well as various other drug and firearm charges, all arising out of illegal activities occurring in Philadelphia, Pennsylvania from April 2021 through early January 2023. *See* ECF No. 1. Maxwell was charged with (1) one count of conspiracy to distribute methamphetamine, phencyclidine, fentanyl, cocaine base, and heroin, in violation of 21 U.S.C. § 846;[1] (2) one count of possession of a controlled substance with

---

[1] Count 1.

intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C);[2] (3) one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(4);[3] and one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).[4] *See* Indictment at 1–12, 23–25. On July 18, 2023, the Grand Jury returned a Superseding Indictment charging Maxwell with the same offenses. *See* Superseding Indictment at 1–13, 24–26, ECF No. 91.

After the filing of the Superseding Indictment, Maxwell filed the instant Motion to Suppress Tangible Evidence Seized Following Unlawful Stop and Search of a Black Bag, with a supporting memorandum of law, on October 17, 2023. *See* ECF No. 181. The Government filed a response in opposition to this Motion on October 31, 2023. *See* ECF No. 183. An evidentiary hearing was held on the Motion on December 12, 2023.[5] The Motion is ripe for disposition.[6]

## II.    DISCUSSION

### A.    <u>Findings of Fact</u>[7]

Based on the evidence presented during the evidentiary hearing on December 12, 2023, the Court makes the following findings of fact:

1.    In approximately March 2022, Special Agent William Becker ("SA Becker") of the Federal Bureau of Investigation ("FBI") started investigating the Gillard Street Gang ("GSG")

---

[2] Count 12.

[3] Count 13.

[4] Count 14.

[5] The hearing on the Motion was held in conjunction with hearings on pretrial motions filed by Maxwell's co-defendants.

[6] At the conclusion of the December 12, 2023 hearing, the parties were given the opportunity to supplement their submissions by no later than December 15, 2023. No such supplements were filed on Maxwell's Motion.

[7] "When factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d).

because of the high volume of crimes, large-scale narcotics trafficking, and instances of violence occurring in the vicinity of 2900 Tulip Street in Philadelphia, Pennsylvania.

2.      SA Becker has worked for the FBI for approximately seven years, and he is currently stationed in the FBI's Philadelphia Division.

3.      SA Becker is assigned to Philadelphia's Safe Street Violent Gang and Drug Task Force ("Task Force"), which the FBI established to identify and dismantle cities' most violent street gangs through the various federal narcotics trafficking and firearm offenses.

4.      SA Becker is a member of the Philadelphia Division's SWAT Team, and he serves as an FBI firearms and tactics instructor.

5.      Prior to joining the FBI, SA Becker was employed as a Patrolman for the Whitpain Township Police Department in Montgomery County, Pennsylvania. While serving as a Patrolman in Whitpain Township, SA Becker was assigned to the Montgomery County District Attorney's narcotics task force, and he operated as a task force officer with Department of Homeland Security investigations.

6.      While SA Becker and the Task Force were investigating the GSG, they conducted over 20 controlled purchases of illegal narcotics from GSG members in the area of 2900 Tulip Street. For these controlled purchases, law enforcement would task multiple Confidential Human Sources ("CHS")—non-law enforcement officers who agreed to cooperate with law enforcement for various reasons, including working off previous criminal charges or receiving monetary compensation—with purchasing evidence from various GSG members. The CHSs were outfitted with video and audio recording equipment when conducting the controlled purchases. The vast majority of controlled purchases in the investigation of GSG were conducted with Co-Defendant Diane Gillard ("Ms. Gillard").

7.      As part of their investigation of the GSG, SA Becker and the Task Force installed pole cameras—covert cameras placed on utility poles, enabling law enforcement to conduct electronic surveillance in areas plagued by high crime and where physical surveillance would be difficult—on 2900 Tulip Street and at the intersection of Memphis and Ann Streets, which was a block away from Tulip Street.

8.      From March 23, 2022, through and including June 1, 2022, SA Becker and the Task Force conducted five controlled purchases from Ms. Gillard in the area of 2900 Tulip Street. These controlled purchases involved purchases of methamphetamine and PCP from Ms. Gillard.

9.      On June 2, 2022, SA Becker received a tip from a CHS that Maxwell was on the intersection of Memphis and Ann Street, was interacting with Ms. Gillard, and possibly had a firearm in his possession. SA Becker had known the CHS for several years and determined that they were a reliable source.

10.     Video from the pole camera located at the intersection of Memphis and Ann Streets on the evening of June 2, 2022, showed Maxwell wearing a white t-shirt, blue jeans, black and white sneakers, and a black bag around his chest. Maxwell had long dreadlocks as well.[8]

11.     During the video footage, Maxwell appeared to make a "hand-to-hand transaction" with another individual wearing a red shirt and shorts.

12.     Based on his training and experience, SA Becker explained that a hand-to-hand transaction is an occurrence where a drug dealer hands a drug customer a particular quantity of narcotics. He has observed hundreds of hand-to-hand transactions over the course of his law enforcement career.

---

[8] Government's Exhibit 4, which was introduced into evidence during the hearing, contains the pole camera surveillance of Maxwell on June 2, 2022. The surveillance video did not contain any audio.

13.     Based on his training and experience, SA Becker believed that Maxwell provided a small quantity of narcotics to the individual in the red shirt.

14.     Later in the video, Maxwell, who had opened the rear passenger door of a black Jeep parked at a street corner, interacted with Ms. Gillard, who was seated in the front passenger seat of the Jeep. They proceeded to hand various items back and forth to each other.[9]

15.     During the entire time he handed items back and forth with Ms. Gillard, Maxwell wore the same black bag across his chest.

16.     After handing items back and forth with Ms. Gillard, Maxwell closed the rear passenger side door. At this time, he was holding a light blue backpack he had retrieved from the Jeep. He then unzipped a front pocket on the light blue backpack and dropped something in the now-unzipped front pocket.

17.     Maxwell next unzipped a pocket on the front of the black bag he carried across his chest and proceeded to retrieve a large orange prescription bottle with a label on it.

18.     Illegal narcotics are regularly stored in prescription bottles, with or without the labels on them.

19.     Maxwell showed the prescription bottle to Ms. Gillard, and she eventually took the bottle from him.[10]

20.     Ms. Gillard later returned the prescription bottle to Maxwell, only to then take Maxwell's black bag.

---

[9] SA Becker identified Maxwell and Ms. Gillard on the video recording.
[10] After Ms. Gillard obtained the prescription bottle, the video footage appeared to show that Ms. Gillard and Maxwell discussed it.

21.     Ms. Gillard appeared to hold the black bag for a short period until returning it to Maxwell. At this point, the front passenger side door of the Jeep closed, with Maxwell now wearing the light blue backpack on his back and carrying his black bag in one of his hands.

22.     Maxwell proceeded to again place the black bag over his shoulder, while moving the light blue backpack to one of his hands.

23.     After briefing interacting with an individual with a long-sleeved black shirt, Maxwell placed the light blue backpack on steps leading to a residence, which was located very close to where he had been meeting with Ms. Gillard. He then proceeded to remove several small items from at least a couple of pockets of the light blue backpack and place those items into his black bag. After removing the items, Maxwell zipped up the pockets on the light blue backpack.

24.     Later, Maxwell handed the light blue backpack to an individual located on the porch next to the stairs where Maxwell had transferred items from the light blue backpack to his black bag.

25.     Maxwell then crossed from one street corner to another, where he met an individual wearing a gray shirt. Maxwell conducted a hand-to-hand transaction with the individual in the gray shirt, who then promptly conducted a hand-to-hand transaction with an individual in a white t-shirt. The individual in the white t-shirt took the item handed to him, passed an item back to the individual in the gray shirt, and then proceeded to walk away. Next, the individual in the gray shirt walked over to Maxwell and began talking with him. The individual in the gray shirt also handed a small item to Maxwell, who placed that item in his left pants pocket.

26.     Soon thereafter, Maxwell handed a small item to the individual in the gray shirt, who then walked away.

27.     A few minutes later, Maxwell briefly reached into his left pocket, retrieved what appears to be United States currency, and quickly returned it into his pocket.

28.     SA Becker could not definitively determine that the currency Maxwell possessed on the surveillance video was from drug transactions.

29.     Based on the surveillance of Maxwell on the pole camera, during which SA Becker observed, *inter alia*, the exchange of the orange prescription bottle and other items between Ms. Gillard and Maxwell, Maxwell taking several items from the light blue backpack and placing them into his black bag, and at least two hand-to-hand transactions, a member of the Task Force contacted the City of Philadelphia Police Department ("Philadelphia P.D.") and requested that they conduct an investigatory stop of Maxwell. The Task Force also informed the Philadelphia P.D. that Maxwell was possibly armed.

30.     SA Becker recognized that the Task Force did not have probable cause to arrest Maxwell at that point because they did not clearly observe him possessing narcotics or a firearm. However, SA Becker, based on his training and experience, his knowledge of the characteristics of the area being surveilled, and the observations from the pole camera video surveillance, believed that law enforcement had reasonable suspicion that Maxwell was involved in criminal activity at the time the Task Force contacted the Philadelphia P.D. to conduct an investigatory stop of Maxwell. Based on his training and experience, SA Becker believed he observed Maxwell engage in hand-to-hand drug transactions.

31.     Philadelphia P.D. Officer Michael Donnelly, along with his partner, Officer Keen, responded to the intersection of Memphis Street and Ann Street to conduct an investigatory stop of Maxwell, in accordance with the request from the Task Force. At the time, both officers were in uniform and using a marked patrol car.

32.     As of June 2, 2022, Officer Donnelly had been with the Philadelphia P.D. for approximately six or seven years and was assigned to patrol Philadelphia's 25th District.

33.     Around 8:00 p.m. on June 2, 2022, Officers Donnelly and Keen received a call requesting that they attempt to speak to Maxwell. They also received a physical description of Maxwell and were informed that he was possibly armed.

34.     After receiving the information about Maxwell, Officers Donnelly and Keen traveled in their patrol car to the intersection of Memphis and Ann Streets and parked the patrol car on the corner of the intersection.[11]

35.     Upon their arrival, Officer Keen asked to Maxwell and at least one other individual in the immediate area, "How we doing guys?" and then followed up with, "What's going on?" and "Anything going on out here?"[12]

36.     As the patrol car parked on the corner, Maxwell watched it park and then casually turned and walked away from the car along the sidewalk.

37.     Officer Keen observed Maxwell walking away from him. He then started to follow Maxwell and said, "Yo guys, can you come back here for me?" While still walking away, Maxwell turned around and looked at Officer Keen. A few seconds thereafter, at about the same time Officer Keen said, "Come here," Maxwell darted between two vehicles parked along the sidewalk and began running away.

38.     Once Maxwell started fleeing, Officer Keen pursued him on foot, while Officer Donnelly reentered the patrol car and pursued Maxwell in the car.

---

[11] Officer Keen was operating the patrol car, with Officer Donnelly riding in the front passenger seat.

[12] Government's Exhibits 5 and 6, which were admitted into evidence during the hearing, contained video and audio recordings from body cameras worn by Officers Donnelly and Keen during their stop and encounter with Maxwell on June 2, 2022.

39.     While pursuing Maxwell, Officer Keen relayed Maxwell's identifying information over the police radio and indicated the direction of the foot pursuit.

40.     The officers pursued Maxwell for approximately 40 seconds, until Officer Donnelly was able to exit the patrol car and tackle Maxwell to the ground in the middle of a street.

41.     While Maxwell was lying on the ground, the officers handcuffed him behind his back. At this time, Maxwell's black bag was located between his torso and the ground.[13]

42.     As the officers lifted Maxwell from the ground and stood him up, Officer Donnelly observed a green-colored firearm located in an open pocket in the black bag. Upon observing the firearm, Officer Donnelly quickly asked Maxwell whether he had a permit to carry. Maxwell responded[14] that he did not have a permit, which compelled Officer Donnelly to announce, "Firearm recovered."

43.     Officer Donnelly never opened any pocket on Maxwell's black bag. The pocket containing the firearm was already opened when Officer Donnelly observed the firearm inside it.

44.     The firearm Maxwell was carrying in his bag was loaded.

45.     After discovering the firearm, Officer Donnelly removed the black bag from Maxwell's torso and carried it in one of his hands.

46.     Officer Donnelly then retrieved Officer Keen's body camera, which had fallen to the ground while the officers restrained Maxwell. and returned it to Officer Keen.

---

[13] When he was tackled, Maxwell fell to the ground face first, with the black bag landing between Maxwell and the pavement.

[14] It was unclear from the video and audio recordings from the officers' body cameras whether Maxwell verbally or nonverbally responded to Officer Donnelly.

47.     The officers then took Maxwell and his black bag to the area where Officer Donnelly had parked their patrol car. The firearm had not yet been removed from the black bag, which Officer Donnelly was still carrying.

48.     The officers placed Maxwell near the open rear door on the driver's side of the patrol car. Officer Donnelly placed the black bag on the driver's side part of the car's hood, nearest to where the hood approaches the windshield. Officer Keen then proceeded to pat down and search Maxwell's person, including his pants pockets.

49.     The video recording from Officer Donnelly's body camera showed the officers locating an identification card for Maxwell, an unknown amount of United States currency, and a cell phone during the search.

50.     While Officer Keen was searching Maxwell's person, two Philadelphia P.D. vehicles arrived at the scene with their overhead lights activated, with those vehicles appearing to be occupied by at least three other Philadelphia P.D. officers, all of whom exited the vehicles and walked to where Maxwell was being held.

51.     While Maxwell was being searched, and shortly thereafter, he attempted to communicate with at least one citizen in the immediate area to get that person to call someone on his behalf. The other individual was permitted to walk over to where Maxwell was located and otherwise stand near the patrol vehicle.[15]

52.     Officer Donnelly took Maxwell's identification card inside the patrol car and interacted with the car's computer console.[16]

---

[15] This other individual appeared to be the individual in the gray shirt recorded on the pole camera surveillance footage from earlier in the evening.

[16] While the Court cannot make this factual finding, it appeared that Officer Donnelly was searching to see if there were any outstanding warrants for Maxwell, especially since upon exiting the vehicle, Officer Donnelly said, "None," to Officer Keen.

10

53.     After completing his interaction with the computer console, Officer Donnelly exited the patrol car and grabbed the black bag that was still lying on the hood of the patrol car.

54.     Officer Donnelly asked for and received gloves from a fellow officer before searching the black bag to "make it safe." Officer Donnelly sought gloves so he could preserve any DNA on the firearm.

55.     Officer Donnelly placed white gloves on his hands and then proceeded to remove the firearm from inside the black bag. To render the firearm safe, he then removed the loaded magazine and removed a round from the chamber of the firearm.

56.     After rendering the firearm safe, Officer Donnelly opened one of the front pockets of the black bag. He briefly removed a single small package and a large orange prescription bottle, before returning them inside the pocket and zipping it shut. He then reached into other pockets of the black bag, but did not remove any other items (if there were any to remove) from the bag.

57.     Officer Donnelly did not begin to remove items, including the firearm, or otherwise search the black bag until approximately two minutes after he had removed it from Maxwell's torso upon observing the firearm in the open pocket.

58.     At the time Officer Donnelly searched the bag, Maxwell was in handcuffs and either still standing just outside the open back door on the driver's side or seated inside the back seat of the driver's side with the door still open. Officer Keen, and at least two other Philadelphia P.D. officers were in close proximity to Maxwell during Officer Donnelly's search of the bag.

59.     At some point while Officer Donnelly was searching through the bag, Maxwell was placed in the driver's side back seat of the patrol vehicle, and the corresponding door closed.[17]

---

[17] Unfortunately, the video recording from Officer Donnelly's body camera does not show when Maxwell was ultimately secured inside the rear of the patrol car. Yet, it occurred **after** Officer Donnelly started searching the black bag.

60.     Officer Donnelly took the unloaded firearm with him inside of the patrol car where he again accessed the console computer to run a check to see if the firearm was stolen. After completing the check, Officer Donnelly returned the firearm to the pocket of the black bag in which he found it. It then appears that he tossed the black bag into the trunk of the patrol car.

61.     Ultimately, law enforcement searched the black bag. The following items were seized from the black bag: (1) a green Taurus handgun; (2) an orange prescription bottle containing 24 containers, each containing what appeared to be crack cocaine; (3) 11 bags of marijuana; and (4) $30 in United States currency.[18]

62.     Law enforcement recovered a cell phone and $270 in United States currency from Maxwell's person.

63.     Officers Donnelly and Keen later transferred Maxwell to Philadelphia P.D.

**B.     The Parties' Arguments**

In his Motion, Maxwell argues that he was subjected to an unlawful warrantless arrest on June 2, 2022. *See* Def.'s Mot. to Suppress Tangible Evid. Seized Following Unlawful Stop and Search of a Black Bag and Mem. of Points and Authorities in Support Thereof ("Mot.") at ECF p. 3, ECF No. 181. In this regard, Maxwell contends that the pole camera surveillance of his activities that evening failed to show that he was possibly involved in any criminal activity. *See id.* Maxwell also asserts that since he was subjected to an unlawful warrantless arrest, any evidence seized from his black bag, which was searched without a warrant, must be suppressed as fruit of the poisonous tree. *See id.* at ECF p. 4.

The Government contends that the Motion should be denied because law enforcement had reasonable suspicion to conduct an investigatory stop of Maxwell based on their observations from

---

[18] *See* Government's Exhibit 7, which was admitted into evidence at the hearing.

the pole camera and prior controlled purchases with Ms. Gillard. *See* Gov't's Omnibus Resp. to Def.'s Pretrial Mot. at 6–8, ECF No. 183. The Government also argues that when Maxwell ran away from Officers Donnelly and Keen, the officers had reasonable suspicion to pursue him and temporarily detain him. *See id.* at 8. The Government further points out that once Officer Donnelly saw the firearm in Maxwell's backpack in plain view, he had probable cause to arrest him and, therefore, could lawfully search his black bag as a search incident to his arrest. *See id.* at 8–9.

### C.   <u>Analysis</u>

#### 1.   **Burden of Proof**

In general, "the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). "However, once the defendant has established a basis for [their] motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government," *id.*, where it needs to show by a preponderance of the evidence "that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005); *see United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) (indicating applicable burden is preponderance of the evidence). In this case, Maxwell has shown that he was subjected to a warrantless arrest and search. As such, the Government has the burden to show by a preponderance of the evidence that the investigatory stop, the ultimate arrest, and the subsequent search were reasonable under the Fourth Amendment.

#### 2.   **The Legality of the Investigatory Stop of Maxwell**

As indicated above, Maxwell argues that law enforcement lacked reasonable suspicion to conduct an investigatory stop of him on June 2, 2022. Maxwell is mistaken. In this regard,

> [t]he Fourth Amendment lets "an officer ... conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."

*Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The reasonable-suspicion standard applies whether the suspect is traveling on foot or by car. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006).

Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123, 120 S.Ct. 673. The officer need articulate only a "'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). To decide whether an officer could have reasonably suspected wrongdoing, we look at the totality of the circumstances. *Id.*

*United States v. Small*, 797 F. App'x 675, 677–78 (3d Cir. 2020) (omission in original). "Courts give considerable deference to police officers' determinations of reasonable suspicion." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).

When determining whether law enforcement had reasonable suspicion to conduct a warrantless investigative stop of a suspect, a court may consider, *inter alia*, whether the suspect (1) was in a "high crime area[,]" *Adams v. Williams* 407 U.S. 143, 144 (1972); or (2) exhibited "nervous, evasive behavior" or fled "upon noticing the police," *Wardlow*, 528 U.S. at 124 (citations omitted).[19] Other considerations may include "[the] suspect's presence on a street at late hour, . . . and [the] suspect's behavior 'that conforms to police officers' specialized knowledge of criminal activity.'" *United States v. Torres*, 534 F.3d 207, 211 (3d Cir. 2008) (quoting *United States v. Brown*, 448 F.3d 239, 249–50 (3d Cir. 2006)). "Additionally, 'the possibility that the

---

[19] "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124. While an individual has a "right to ignore the police and go about [their] business" if approached by an officer without reasonable suspicion or probable cause, "unprovoked flight is simply not a mere refusal to cooperate" because "[f]light, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Id.* at 125. Thus, "[a]llowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about [their] business or to stay put and remain silent in the face of police questioning." *Id.*

persons subject to police action are themselves violent or dangerous, ... [and] the possibility that the suspect may be armed' are also relevant factors to a district court's analysis of reasonable suspicion." *United States v. Scott*, 420 F. Supp. 3d 295, 311 (E.D. Pa. 2019) (alterations in original) (quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007)). Furthermore, "'legal, innocent behavior at times corroborates other information to raise reasonable suspicion.' Nonetheless, 'under a totality of the circumstances test, even factors independently "susceptible to innocent explanation" can collectively amount to reasonable suspicion.'" *Id.* (quoting *Brown*, 448 F.3d at 252).

Here, members of the Task Force had ample reasonable suspicion that Maxwell was engaged in criminal activity when they requested the Philadelphia PD to conduct an investigatory stop of him. In less than three months prior to Maxwell's arrest, including the day prior to Maxwell's arrest, the Task Force had conducted several controlled purchases of illegal narcotics from Ms. Gillard in the area of 2900 Tulip Street.[20] SA Becker pointed out that this area was a high crime area where there were incidents of violence and narcotics trafficking.

Then, after receiving a tip from a reliable CHS about Maxwell being in the area of 2900 Tulip Street, interacting with Ms. Gillard, and potentially possessing a firearm, the Task Force conducted video surveillance of Maxwell in the area from a pole camera. The video recording from that surveillance showed, *inter alia*, (1) Maxwell meeting with Ms. Gillard and exchanging items with her, (2) Maxwell taking a light blue backpack from the vehicle in which Ms. Gillard was seated and transferring numerous items from that backpack into the black bag that he had carried across his chest during most of the surveillance footage, (3) Maxwell retrieving a large orange

---

[20] The Court recognizes that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)).

prescription bottle with a label from his black bag, handing it to Ms. Gillard, and having her return it to him, and (4) Maxwell engaging in at least two hand-to-hand transactions with individuals where he surreptitiously handed small items to those individuals and, on one occasion, received a small item from an individual. Along with these observations from the video recording, SA Becker explained that in his extensive training and experience, drug dealers often use hand-to-hand transactions to deliver drugs to drug purchasers, and he explained that orange prescription bottles, with or without the labels still on them, are often used to package and transport illegal narcotics. Overall, the totality of the circumstances from the controlled purchases from Ms. Gillard as well as law enforcement's observations of Maxwell during the evening of June 2, 2022, supplied the Task Force members observing him with a "'particularized and objective basis' for suspecting legal wrongdoing," which supported the investigative stop of Maxwell. *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 417).

Furthermore, since the Task Force members observing Maxwell on June 2, 2022 had reasonable suspicion to conduct an investigatory stop of him, Officers Donnelly and Keen, despite not having personally observed any potential criminal activity, also had reasonable suspicion to conduct an investigatory stop Maxwell because of the "collective knowledge doctrine."[21] This doctrine provides that "the knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest." *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010); *see also Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983) ("[T]he knowledge

---

[21] The Court recognizes that certain information about Maxwell, such as his description and the possibility of him being armed, was relayed to Officers Donnelly and Keen prior to their investigatory stop. Nevertheless, the existing record does not show how much information about Maxwell's narcotics activity was provided to the officers. Regardless, as explained in this paragraph, the Task Force members' reasonable suspicion was imputed to the officers and supported their investigatory stop of Maxwell.

of one is presumed shared by all.").[22] Thus, the Task Force members' knowledge of what they observed during their investigation of the GSG and while surveilling Maxwell on the evening of June 2, 2022, as well as the information provided by the reliable CHS, was imputed to Officers Donnelly and Keen when they attempted to conduct an investigatory stop of Maxwell only to have him run away. This knowledge also remained imputed to the officers when they ultimately conducted the investigatory stop after they finally chased him down after he fled. Consequently, since Task Force members had reasonable suspicion to conduct an investigatory stop of Maxwell, so did Officers Donnelly and Keen. *See United States v. Kaplan*, 526 F. App'x 208, 210, 214 (3d Cir. 2013) (concluding that knowledge obtained by two Pennsylvania State Troopers through wiretaps, indicating that individual would be transporting illegal narcotics by vehicle, was imputed to other Troopers who were directed to stop individual's vehicle and therefore supported finding of reasonable suspicion to stop vehicle).

### 3.    The Legality of the Search and Seizure

Having determined that there was reasonable suspicion for the investigatory stop of Maxwell, the Court now turns to whether the search of him and his black bag was lawful. The Court notes that Maxwell was not seized until Officers Donnelly and Keen physically restrained him after they caught up with him. *See Brown*, 448 F.3d at 245 ("A seizure occurs when there is

---

[22] In *Whitfield*, the Third Circuit explained that

> it would make little sense to decline to apply the collective knowledge doctrine in a fastpaced, dynamic situation such as we have before us, in which the officers worked together as a unified and tight-knit team; indeed, it would be impractical to expect an officer in such a situation to communicate to the other officers every fact that could be pertinent in a subsequent reasonable suspicion analysis.

634 F.3d at 745. The Third Circuit concluded that after "[a]pplying the collective knowledge doctrine here, there is little question that there was reasonable suspicion to seize Whitfield." *Id.*

either (a) a laying on of hands or application of physical force to restrain movement, even when it

is ultimately unsuccessful, or (b) submission to a show of authority." (internal quotation marks

omitted)). As already explained, this physical restraint of Maxwell was lawful because the officers

had reasonable suspicion to conduct an investigatory stop and Maxwell had fled from them. *See*

*United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) ("In effectuating a valid stop, police

officers are allowed to use a reasonable amount of force.").

Within seconds after being lawfully restrained, and while standing up Maxwell from the

ground, Officer Donnelly observed a firearm in an open pocket of Maxwell's black bag, which

meant the firearm was in his plain view and could lawfully be seized.[23] *See Sanchez v. United*

*States*, 860 F. App'x 253, 255 (3d Cir. 2021) ("Evidence may be seized without a warrant if 1) the

officer did not violate the Fourth Amendment in arriving at the place from which the evidence

could be plainly viewed, 2) the item's incriminating character was immediately apparent, and 3)

the officer had a lawful right to physically access the object itself." (citing *Horton*, 496 U.S. at

---

[23] Concerning a warrantless search under the "plain view doctrine,"

> the Fourth Amendment [generally] requires that law enforcement officers seize evidence pursuant to a "warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). This requirement, however, is subject to several exceptions, including the plain view doctrine. *See Horton v. California*, 496 U.S. 128, 133-37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Under the plain view doctrine, officers may seize incriminating evidence they come across if (1) they have not "violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; (2) "the incriminating character of the evidence [is] immediately apparent"; and (3) they "have a lawful right of access to the object itself." *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (cleaned up). The Government bears the burden of establishing that the plain view doctrine applies to the seizure in question. *See United States v. Bey*, 911 F.3d 139, 145 (3d Cir. 2018) ("Warrantless searches and seizures are presumptively unreasonable unless the Government satisfies its burden of establishing that one of the exceptions to the warrant requirement applies.").

*United States v. Dyer*, 54 F.4th 155, 158–59 (3d Cir. 2022), *cert. denied*, 143 S. Ct. 2616 (2023).

136–37; *Menon*, 24 F.3d at 559)). Maxwell also acknowledged not having a permit to carry the firearm, which gave Officers Donnelly and Keen probable cause to arrest him. *See United States v. Bond*, 173 F. App'x 144, 146 (3d Cir. 2006) ("[U]nder Pennsylvania law, a police officer has probable cause to arrest an individual for [violating 18 Pa. C.S. § 6108] based solely on the officer's observation that the individual is in possession of a firearm on the streets of Philadelphia." (citing *Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996))); *Florida v. White*, 526 U.S. 559, 565 (1999) ("[A]lthough a warrant presumptively is required for a felony arrest in a suspect's home, the Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred." (citing *United States v. Watson*, 423 U.S. 411, 416–24 (1976))); *United States v. Vasquez*, 864 F. Supp. 2d 221, 239–40 (E.D.N.Y. 2012) (concluding that police officers had probable cause to arrest defendant for criminal possession of weapon because they observed handgun was in plain view).[24]

Regarding the search of the backpack, because Officers Donnelly and Keen lawfully arrested Maxwell, they could conduct a warrantless search incident to his arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search

---

[24] "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (citation omitted). The Court uses a totality-of-the-circumstances approach to assess the reasonableness of the officer's conduct, considering the officer's perspective at the time they acted. *Carswell v. Borough of Homestead*, 381 F.3d 235, 246 (3d Cir. 2004). The standard is "not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). Probable cause exists if "at the moment the arrest was made ... the facts and circumstances within [the defendant's] knowledge and of which [they] had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the plaintiff had violated the law. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

incident to the arrest requires no additional justification."); *United States v. Kithcart*, 134 F.3d 529, 531 (3d Cir. 1998) ("When a warrantless search is made pursuant to an arrest, '[t]he constitutional validity of the search ... must depend upon the constitutional validity of the ... arrest.'" (omissions in original) (quoting *Beck*, 379 U.S. at 91)). A search incident to a lawful arrest is "[a]mong the exceptions to the [Fourth Amendment's] warrant requirement." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citing *Weeks v. United States*, 232 U.S. 383, 392 (1914), *overruled on other grounds by Elkins v. United States*, 364 U.S. 206 (1960)).[25] "[T]he rationale for a search incident to arrest is to seize weapons and to prevent the destruction of evidence of the crime[. As such,] it is limited in scope to 'a search of the arrestee's person and the area within [their] immediate control.'" *United States v. Bradley*, Crim. No. 20-CR-220, 2022 WL 16748606, at *5 (M.D. Pa. Nov. 7, 2022) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)); *see Chimel*, 395 U.S. at 762–63 ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape."); *United States v. Muldrow*, Crim. A. No. 20-14, 2020 WL 6445952, at *11 (E.D. Pa. Nov. 3, 2020) ("The search-incident-to-arrest-exception to the Fourth Amendment's warrant requirement serves two purposes: (1) 'protecting arresting officers'; and (2) 'safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy.'" (citing *Gant*, 556 U.S. at 339)). The area within an arrestee's immediate control includes "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763.

---

[25] The Fourth Amendment generally requires officers to have a valid warrant before conducting a search or seizure. *See Robertson*, 305 F.3d at 167 ("Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." (citing *Katz v. United States*, 389 U.S. 347, 356–57 (1967))).

In addition,

> "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply.[26] . . . "[A]lthough this standard requires something more than the mere theoretical possibility that a suspect might access a weapon or evidence, it remains a lenient standard."[27] It further held an officer does not eliminate the possibility an arrestee could harm an officer or destroy evidence simply by placing a suspect in handcuffs,[28] but has also noted we should assume the arrestee "was neither an acrobat [nor] a Houdini."[29]

*Muldrow*, 2020 WL 6445952, at *11 (footnotes, first and last alterations in original).

Here, Officers Donnelly and Keen had handcuffed Maxwell shortly before they searched his black bag. Although Maxwell was in handcuffs during the search, this fact does not render the warrantless search unlawful. *See Shakir*, 616 F.3d at 319 (concluding lawful search incident to arrest occurred where defendant "was handcuffed and restrained by two policemen at the time his bag was searched[,] . . . was standing up at the time of the search, . . . was in a public place with some 20 people around, and his bag was right next to him"). In addition, the search occurred approximately two minutes after Officer Donnelly took the black bag from Maxwell. *See United States v. Fleming*, 677 F.2d 602, 607–08 (7th Cir. 1982) (concluding five-minute delay between seizing suspect's bag and seizing it did not invalidate warrantless search of bag incident to arrest). Moreover, Maxwell was not yet locked in the patrol vehicle as the rear driver side door was open when Officer Donnelly started to search the black bag, Maxwell had been trying to speak to at least one other person who was located in the immediate area around the patrol car, and Officer Donnelly had already discovered a firearm (which was later discovered to be loaded) in plain view

---

[26] [*Gant*, 556 U.S. at 339.]
[27] [*United States v. Shakir*, 616 F.3d 315, 321 (3d Cir. 2010).]
[28] *Id.*
[29] *United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002) (quoting *United States v. Abdul-Saboor*, 85 F.3d 664, 669 (D.C. Cir. 1996)).

in the bag.[30] At bottom, there is "no objective basis upon which [this Court] can conclude that

[Officers Donnelly and Keen] had no reason to fear either the arrestee or the environment in which

the arrest unfolded." *Myers*, 308 F.3d at 274. Accordingly, Officer Donnelly conducted a lawful

warrantless search of the black bag incident to Maxwell's lawful arrest.[31]

---

[30] If Maxwell had been already locked in the back seat of the patrol car by the time Officer Donnelly searched his black bag, it appears that the Government would have struggled to satisfy its burden to prove by a preponderance of the evidence that the search was lawful as a search incident to Maxwell's lawful arrest. *See, e.g.*, *United States v. Matthews*, 532 F. App'x 211, 218 (3d Cir. 2013) (concluding trial court correctly determined that warrantless search of backpack occurring while defendant was already handcuffed in the rear of a police vehicle was not "justified under the search incident to arrest exception" because "there was no reasonable probability that [defendant] could have accessed the backpack" at time of search).

[31] Both the parties' submissions and the evidence presented during the hearing focused on the legality of Officer Donnelly's warrantless search of the black bag at the time of Maxwell's arrest. However, the recording from Officer Donnelly's body camera never showed him actually seizing all the evidence law enforcement noted it ultimately seized from the black bag. Instead, the recording showed him searching the black bag seemingly for safety purposes, having previously observed a firearm inside the bag, and not necessarily for evidence of criminal activity. The only items from the black bag Officer Donnelly appeared to physically touch in the recording were a package which apparently was later determined to hold marijuana, the orange prescription bottle, and the firearm (and its components once rendered safe). The recording did not show Officer Donnelly seize 10 additional bags of marijuana or $30 in United States currency.

Although it does not appear that Officer Donnelly seized all items from the black bag in the video, law enforcement must have subsequently searched the black bag again seized 10 additional bags of marijuana and $30 in United States currency. In addition, at some point after Officer Donnelly's search of the black bag, law enforcement must have searched inside the orange prescription bottle and seized the 24 containers of crack cocaine noted as having been stored inside the bottle. Since there is nothing in the current record about law enforcement having obtained a search warrant to conduct a full search of the black bag and seize these items, the only reasonable inference is that law enforcement later conducted a warrantless search of the black bag to seize these items.

As already explained above, Maxwell had the initial burden of identifying all bases for his Motion to Suppress. *See Johnson*, 63 F.3d at 245. Maxwell did not raise a concern about the constitutionality of the search during which law enforcement ultimately seized all items pictured in Commonwealth's Exhibit 7. Instead, as stated above, his basis for suppressing evidence seized from the black bag was premised on only Officer Donnelly's search at the time of his arrest. *See* Mot. at ECF p. 2 ("After Maxwell was placed in custody and no longer had the ability to physically take control of the black bag, the officers conducted a warrantless search and discovered a gun, controlled substances, a small amount of US [sic] currency and a cell phone."). Since Maxwell did not challenge any search occurring after Officer Donnelly's search of the black bag, the Government was not placed on notice that it needed to introduce evidence on that issue during the

## III.    CONCLUSION

As explained above, members of the Task Force conducting surveillance through the pole

camera at 2900 Tulip Street on the evening of June 2, 2022, had reasonable suspicion that Maxwell

---

evidentiary hearing on December 12, 2023. Accordingly, this Court will not address the constitutionality of the search ultimately resulting in the seizure of all items from the black bag.

Even if the Court were to address that probable subsequent search, suppression would not be warranted because of the "independent source doctrine." This doctrine provides that "[e]vidence obtained by the police unlawfully may nonetheless be admitted into evidence 'if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Bradley*, 959 F.3d 551, 557 (3d Cir. 2020) (quoting *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)); *see also United States v. Wright*, 777 F.3d 635, 641 (3d Cir. 2015) (concluding trial court properly denied motion to suppress even though Fourth Amendment violation occurred because violation "had no impact on the evidence that could be deployed against Wright at trial" insofar as "the agents would have collected precisely the same evidence, and Wright would have been unable to stop them"); *United States v. Herrold*, 962 F.2d 1131, 1140 (3d Cir. 1992) ("[T]he inevitable discovery doctrine . . . permits the introduction of evidence that inevitably *would have been* discovered through lawful means, although the search that actually led to the discovery of the evidence was unlawful."). This doctrine "permits the court to balance the public interest in providing a jury with all relevant and probative evidence in a criminal proceeding against society's interest in deterring unlawful police conduct." *Vasquez De Reyes*, 149 F.3d at 195. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense." *Nix v. Williams*, 467 U.S. 431, 444 (1984).

Here, the black bag would have been legally searched pursuant to the inventory procedures of the Philadelphia P.D. or FBI. "[I]t is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983). Any inventory search of the black bag would have discovered all items inside it, including the illegal narcotics and the United States currency ultimately seized. *See United States v. Lockett*, No. CRIM. 03-421, 2004 WL 73726, at *4 (E.D. Pa. Jan. 12, 2004) ("During these legal [inventory] searches, the contraband material, including the second gun, pound of marijuana, drug packaging and paraphernalia, and ammunition found in Lockett's bags when [the officers] searched them at the police station, would have inevitably been discovered."). Accordingly, all items recovered from the black bag are admissible under the inevitable discovery doctrine. *See United States v. Matthews*, 532 F. App'x 211, 225 (3d Cir. 2013) ("[E]ven if we were to find the search of Matthews' backpack unconstitutional, we agree with the District Court that the evidence in question would have been discovered pursuant to a valid inventory search at the police station when Matthews was processed, and thus it was properly admitted under the inevitable discovery doctrine."); *Lockett*, 2004 WL 73726, at *4 (admitting items that would have been seized as part of lawful inventory search at police station under inevitable discovery doctrine).

was engaged in criminal activity when they requested the Philadelphia P.D. to conduct an investigatory stop of him. The Task Force members' reasonable suspicion was imputed to Officers Donnelly and Keen when they traveled to the intersection of Memphis and Ann Streets to conduct the investigatory stop. This reasonable suspicion was arguably enhanced when Maxwell fled from the officers on foot and, thus, justified their restraint of him after they finally caught him. Therefore, the investigatory stop of Maxwell was lawful under the Fourth Amendment.

Additionally, Maxwell was not subjected to an unlawful arrest because Officer Donnelly had probable cause to arrest him once he observed the firearm (for which Maxwell did not have a permit to carry) while it was in plain view in Maxwell's black bag, which he was wearing at the time of the arrest. Officer Donnelly's subsequent warrantless search of the black bag was proper as a search incident to Maxwell's arrest. Overall, neither the investigative stop, the warrantless arrest, nor the warrantless search of the black bag violated the Fourth Amendment. Accordingly, the instant Motion will be denied.

An appropriate order follows.

BY THE COURT:

_/s/ John M. Gallagher_____
JOHN M. GALLAGHER
United States District Court Judge